**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CORTLAND LINE HOLDINGS LLC and
JOHN WILSON,

                      Plaintiffs,

      v.                                            5:18-cv-307
                                                        (TJM/DEP)

JASON LIEVERST,

                      Defendant.

_____

**Thomas J. McAvoy, Sr. U.S.D.J.**


### DECISION & ORDER

     Before the Court is Plaintiffs' motion for a preliminary injunction in this matter that

grew out of Defendant's employment with Plaintiff Cortland Line Holdings, LLC ("Cortland

Line"), a manufacturer of fly-fishing equipment.  See dkt. # 7.  The Court earlier extended

a temporary restraining order issued by the New York Supreme Court, Cortland County,

see dkt. # 18, and Plaintiffs now seek a preliminary injunction to extend the restraints on

Defendants' commercial activity.

**II.    BACKGROUND**

     Cortland Line manufacturers fly-fishing equipment.  For a period of time, Plaintiffs

employed Defendant Jason Lieverst, a professional angler known worldwide among fly

fishers for his innovative techniques, to help market its products.  Defendant's employment

contract contained a restrictive covenant preventing Lieverst from engaging in certain

activities for two years.  Plaintiffs filed the underlying Complaint and sought injunctive relief

against the Defendant when Defendant allegedly began soliciting Plaintiffs' customers for

a fly-rod business he had started.  Plaintiffs contend that these actions violated the

restrictive covenants in Defendant's contract.  They sought relief from the state court for

various claims arising from this conduct.

Plaintiffs' state-court Complaint has eleven causes of action related to this conduct.

First, Plaintiffs allege that Defendant breached his contract with Plaintiffs by retaining

Plaintiffs' confidential information, disclosing that information and trade secrets, and

soliciting Plaintiffs' customers and vendors.  Complaint, dkt. # 2, at ¶ 78.  Plaintiffs also

contend that Defendant sold Plaintiffs' products to third parties without consent.  Id.  The

second cause of action alleges unfair competition and the third misappropriation and

misuse of trade secrets.  The fourth contends that Defendant breached his common-law

fiduciary duty by revealing Plaintiffs' methods, customers, and techniques.  The fifth cause

seeks a permanent injunction and the sixth an accounting.  The seventh seeks declaratory

judgment.  The eighth cause of action alleges defamation, slander, and trade libel,

alleging that Defendant made defamatory statements about Cortland Line and its

President, Plaintiff John Wilson.  Plaintiff alleges conversion in the ninth cause of action.

Unjust enrichment forms the basis of the tenth cause of action and fraud the eleventh.

Upon filing the Complaint, Plaintiffs sought injunctive relief from the State court.

The court issued an order prohibiting Defendant from:

> 1.  Utilizing or disseminating Cortland Line's confidential and proprietary
> business documents and information, including, but not limited to, any e-
> mails, books, records, data, reports, correspondence, customer or vendor
> information, client or prospect lists, referral lists, or other confidential
> business and proprietary documents or information of any kind, in written or

electronic form, belonging to Cortland Line;

2.  Directly or indirectly engaging in any business with customers and vendors with whom Defendant did business while employed by Cortland Line;

3.  Directly or indirectly using knowledge gained while employed by Cortland Line to solicit, divert or accept business from any customers or vendors of Cortland Line;

4.  Destroying, deleting, altering or removing any computer files or documents or other property that belongs to Cortland Line or any customers or vendors of Cortland Line; and

5.  Destroying, deleting, altering or removing any computer files, records, communications or information which relate to Defendant's communications with or to any of Cortland Line's customers or vendors, or to the claims set forth in the Verified Complaint filed in this action.

Plaintiffs moved to extend these restraints after Defendant removed the case to this Court. See dkt. # 9.  The Court granted the motion, extending the restraints until the Court had time to consider Plaintiffs' motion for a preliminary injunction.  The Court has now considered that motion.

## II.  LEGAL STANDARD

Plaintiffs here seek a preliminary injunction.  "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) the balance of hardships tips in the plaintiff's favor; and (4) that the 'public interest would not be disserved' by the issuance of an injunction."  Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (quoting Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010)).  "The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits."  Tom Doherty Assocs. v. Saban Entm't Inc., 60 F.3d 27, 34 (2d Cir. 1995).

3

When an injunction "alter[s] the status quo by commanding some positive act," however, that injunction is "mandatory." Id. Such an "injunction should issue 'only upon a clear showing that the moving party is entitled to relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" Id. (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).

## III.    ANALYSIS

Three issues are before the Court.  The Court will address each in turn.

### A.    Preliminary Injunction

Plaintiffs offer several grounds for why the Court should enjoin Defendant, which the Court will address as appropriate.

#### i.    Likelihood of Success on the Merits

Plaintiffs focus on the likelihood of success on the merits of their various claim. They concentrate on several of their claims in making this argument.  For reasons that will become apparent, the Court has focused on the breach-of-contract claim.

##### a.    Breach of Contract

Plaintiffs argue that they have demonstrated a substantial likelihood of success on the merits of their breach-of-contract claim, which alleges that Defendant violated the restrictive covenants contained in his employment contract.  Plaintiffs allege that Defendant violated the agreement by engaging in a business competitive with Plaintiffs', soliciting Corltand Line customers and/or vendors, and using Cortland Line's confidential information to do so.   Defendant responds that these restrictive covenants are unenforceable and that Plaintiffs have not identified any protectable interests that his

4

conduct violated.  Plaintiffs' customer lists and information are not secret, and Plaintiffs

have not identified any specific trade secrets that Cortland possesses.  Cortland's

methods for designing, building and acquiring fly rods are not trade secrets.  Moreover, the

fly rods that Defendant is now selling are made by a different manufacturer and are of a

vastly different quality than those sold by Cortland.  Therefore–even if Cortland had any

design expertise–Defendant did not use Cortland's trade secrets to build those rods.[1]

Defendant argues that Cortland thus cannot seek an injunction to protect such interests.

The employment contract at issue here was between Cortland Line and Jason

Lieverst, and effective January 13, 2017.  See dkt. # 34-1.  The contract contains a

"confidentiality" provision.  Id. at ¶ 8.  That provision states that Defendant:

> recognizes Cortland Line has and will have information regarding the following:
> -inventions
> -products
> -product design
> -processes
> -technical matters
> -trade secrets
> -copyrights
> -customer lists
> -prices

_____

[1]Defendant argues that:

Cortland cannot assert that it has provided Defendant with any confidential information or trade secrets.  It is clear that the Master Nymph, LLC rod is so unique in terms of its quality, design, manufacturing process and price point that Cortland has no basis for asserting that Defendant has wrongfully used its proprietary information to the extent that Plaintiffs can sustain their burden of proving its existence in the first instance.  Having failed to establish that it has a protectable interest and that Defendant is unfairly competing or has misappropriated its confidential information or trade secrets, Cortland cannot demonstrate its entitlement to any injunctive relief.

Defendant's Brief, dkt. # 22, at 26.

-costs
-discounts

-business affairs
-future plans
-Marketing, or other product knowledge and other vital information (collectively, "Information") which are valuable, special and unique assets of Cortland Line. Jason Lieverst agrees that Jason Lieverst will not at any time or in any manner, directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of Cortland Line. Jason Lieverst will protect the Information and treat it as strictly confidential. A violation of Jason Lieverst of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.

Id.

The contract also contains three restrictive covenants.[2] At issue here are the first and third restrictive covenants. The first covenant restricts the disclosure or threatened disclosure of any of the "confidential information" described above. The provision provides that "Cortland Line shall be entitled to an injunction to restrain Jason Lieverst from disclosing, in whole or in part, such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed." Id. at ¶ 1, Restrictive Covenants. The third covenant is a "non-compete agreement. Id. at ¶ 3, Restrictive Covenants. That provision reads, in relevant part:

Jason Lieverst recognizes that the various items of Information are special and unique assets of the company and need to be protected from improper disclosure. In consideration of the disclosure of the Information to Jason Lieverst, Jason Lieverst agrees and covenants that during his or her [sic] employment by Cortland Line and for a period of 2 years following the termination of Jason Lieverst's employment, whether such termination is voluntary or involuntary, Jason Lieverst will not directly or indirectly engage in any business competitive with Cortland Line. Directly or indirectly engaging in any competitive business includes, but is not

---

[2]The numbering for these covenants begins after the eighth paragraph of the agreement cited above. For convenience, the Court will cite them for the paragraph numbers they provide. All three come after paragraph 8, cited above.

limited to (i) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming directly or indirectly engaged in any such business, or (iv) soliciting any customer of Cortland Line for the benefit of a third party that is engaged in such business. Jason Lievert agrees that this non-compete provision will not adversely affect Jason Lieverst's livelihood.

Id.

Plaintiffs allege that Defendant violated these restrictive covenants both during and after his employment by engaging in business competitive with Cortland Line, by soliciting Cortland Line Customers for his own business, and by using Cortland Line's confidential information–as defined in the agreement–to do so. Plaintiffs point to record evidence that they contend establishes that Defendant, within three months of ending his employment with Cortland line, had sold more than 103 fly-fishing rods around the world, that he intended to sell more such rods on a larger scale. See Plaintiff's Brief, dkt. # 7-1, at 6, Exh. D to Plaintiff's Complaint, dkt. # 42-1. Plaintiffs also point to this evidence to allege that Defendant sought Cortland-produced line material from an exclusive Cortland Line vendor (who supplied Plaintiffs with this e-mail) to complement the rods he was selling. Id. Plaintiffs allege that this evidence establishes that Defendant had established a new company, Master Nymph, LLC, which competed directly with Cortland Line in the sale of fly-fishing rods and component parts. Plaintiff's Brief, at 7. As Plaintiffs summarize the situation:

Such evidence confirms that Defendant has engaged in business competitive with Cortland Line, solicited Cortland Line's customers and vendors, and utilized Cortland Line's confidential information, all in breach of his contractual obligations, for the benefit of himself and his new business, to the detriment of Cortland Line.

Id. at 8.

Defendant submits a number of affidavits in response to Plaintiffs' motion. Some of

these affidavits come from professional fly fishers, like Mac Brown.  See dkt. # 23.  Brown

relates that he has used both Cortland Line's nymph rods and the Master Nymph Rod

produced by Defendant, and that the Master Nymph Rod far exceeds Cortland Line's in

quality.  Id. at ¶¶ 2-6.  The affidavit reads like an advertisement for Defendant's products:

"[a] Master Nymph rod is truly a thing of beauty and functionally a joy to fish with on the

water!"  Id. at ¶ 6.  Likewise, the affidavit of Richard Ferrara, a competitive fly fisher,

relates that he had used a Corland Line competition nymph rod for a year and a half and

"really liked it."  Ferrara Affidavit, dkt. # 24, at ¶ 4.  While the Master Nymph rod is similar,

it "is in no way identical" and Ferrara finds it superior to Cortland Line's product.  Id. at ¶¶

7, 9-11.  Brandon Harrison, another guide and competitive fly fisher, reports that he has

used Cortland Line's high-end nymphing rod, as well as other models produced by other

companies.  Harrison Affidavit, dkt. # 25, at ¶¶ 1-2.  The fast action, balance, and strength

of Defendant's Master Nymph, Harrison reports, means that the Master Nymph rod is far

superior to Cortland Line's.  Id. at ¶¶ 2-5.  Harrison plans to purchase another Master

Nymph rod.  Id. at ¶ 10.  Other affidavits from fly fishers with similar competitive profiles

also differentiate the quality of Defendant's rods from Cortland Lines, extolling the quality

and innovation they reflect, which separate them from all competitors' products.  See dkt.

#s 26-28

      Defendant submits a detailed affidavit in opposition to Plaintiffs' motion.  See dkt. #

12.  Defendant's affidavit admits that he currently works to sell Master Nymph rods, which

were built by his wife's Washington-State-based company, North Fork Composite.  Id. at ¶

9.  Defendant founded Master Nymph in 2008 when he was living in the Netherlands.  Id.

at ¶ 21.  The company sold hand-tied flies suitable for the European nymphing technique,

a method of fly fishing for which he was renowned.  Id. at ¶¶ 21, 16-19.  Defendant also worked to promote international fly-fishing competitions.  Id. at ¶ 23.  As a result of his work, he "got to know hundreds of top fishers[.]" Id. at ¶ 24.  He first encountered Cortland Line fly-fishing rods at a competition in North Carolina in 2012.  Id. at ¶ 26.  Lieverst took some back to Europe with him, but found they were of poor quality and broke easily, and that few in Europe were aware of the company.  Id. at ¶ 27.  Defendant contacted the company, offering to help introduce and promote their products in Europe.  Id. at ¶¶ 27–8. After this initial contact, Defendant eventually came to promote Cortland Line rods in Europe at various fishing events in competitions, often using them during the events.  Id. at ¶¶ 28-31.  He also consulted with Cortland Line about how to improve the quality of the company's rods.  Id. at ¶ 32.

Defendant reports that he decided near the end of 2013 that he wanted to come to the United States to live and work.  Id. at ¶ 35.  He recognized that he needed an 0-1 Visa, aimed at those with special skills and ability, to do so.  Id.  Defendant met Plaintiff John Wilson, Cortland's head, at the 2015 Youth World Championships.  Id. at ¶ 37.  Wilson told him that he was Defendant's "biggest fan."  Id.  Defendant was still in Europe when Wilson contacted him in 2016, seeking Defendant's aid in improving Cortland's recognition and presence in European markets.  Id. at ¶¶ 42-43.  Defendant agreed to help Cortland Line set up sales and distribution channels in Europe, earning $1500 a month.  Id. at ¶¶ 44-45.  Defendant negotiated some deals for Cortland in Europe and other places around the world, like South Africa.  Id. at ¶¶ 48-50.  The company set him up with an office and sent him products, which he was permitted to sell to supplement his earnings.  Id. at ¶¶ 51-53.

Defendant flew to Cortland in April 2016 to discuss new product lines with the company. Id. at ¶ 54. Cortland Line particularly wanted Defendant's input on the design of fishing rods which would be built in a Korean plant. Id. at ¶ 55. Defendant described the specifications for the rods and a Cortland Line employee who identified a Korean factory which could manufacture them. Id. at ¶ 55. Cortland itself did not supply any of the specifications. Id. at ¶ 56. After the plant began making the rods, Cortland Line sent Defendant the prototypes to test and show in Europe. Id. at ¶ 57. Cortland Line permitted Defendant to sell some of the rods in Europe to supplement his income. Id. at ¶ 60.

According to Defendant, Cortland Line wanted to introduce its new rods to competitors at the world fly-fishing championships in Vail, Colorado in 2016. Id. at ¶ 61. Defendant, who knew most of the competitors from his work and from competing, helped arrange for Cortland Line to sponsor the competition and convinced competitors to use Cortland rods. Id. at ¶¶ 62-64. After that event, Wilson asked Defendant to go to Europe to oversee final production of the Cortland Line rods manufactured there. Id. at ¶ 65. Wilson wanted Defendant's advice on "various asthetic and design changes." Id. At the factory, Defendant saw rods being made for a number of Cortland's competitors in the fly-fishing market. Id. at ¶ 66-67. Defendant asserts that Cortland did not provide any specific manufacturing instructions, and that the Koreans actually kept the exact process confidential. Id. at ¶¶ 70-71.

Defendant reports that he talked frequently with Wilson about obtaining an 0-1 Visa. Id. at ¶ 72. Wilson eventually agreed to sponsor that Visa application. Id. While Defendant disputes whether he actually signed the contract attached to Plaintiff's Complaint, there is no dispute that he came to a contractual agreement with Cortland Line,

and that the company sponsored him for an 0-1 Visa.  Id. at ¶ 75.  Defendant began

working with Cortland Line and living in Wilson's home, but conflict with Wilson soon

arose.  Id. at ¶¶ 76-80.  Defendant's conflict with Wilson intensified after he started seeing

the woman who would become his wife, and Defendant eventually felt he needed to leave

the company.  Id. at ¶ 83.  Defendant resigned from Cortland Line on May 26, 2017.

Defendant affirms that, after leaving Cortland Line, he began thinking about

producing his own fly rods with the help of his wife's firm.  He contacted Wilson and told

him of his plans to sell rods for $950, which would be the most expensive rods made.  Id.

at ¶ 90.  Defendant contends that Wilson laughed at the price Defendant intended to

charge, and gave him his "blessing" to try.  Id. at ¶ 91.  Defendant also claims he would

not have started his company without Wilson's permission.  Id. at ¶ 92.

Defendant's affidavit, and those filed in support of his opposition to the motion for a

preliminary judgment, are sufficient, along with Plaintiffs' allegations in their Complaint and

in the affidavits provided in support of the motion, for the Court to determine that a

likelihood of success on the merits of Plaintiffs' contract claim exist.  The contract in

question has a non-compete agreement, described above, which prohibits Defendant from

"directly or indirectly engag[ing] in any business competitive with Cortland Line."

Restrictive Covenant at ¶ 3.  Defendant admits to attempting to sell his Master Nymph

rods to many of the same competitors to whom he had earlier promoted the Cortland Line

rods.  He does not deny this claim.  While Defendant attempts to argue that Cortland Line

had no specific knowledge in the actual manufacture of rods and relied instead on the

expertise of Korean manufacturers, nothing in Defendant's affidavit or other supporting

documents indicates that he had any particular knowledge of how rods were manufactured

11

before going to Korea at Plaintiffs' request and to supervise production of Plaintiffs' designs.  He does not allege that he somehow obtain such knowledge of processes before arriving at Cortland Line.  Instead, Defendant went to Korea to consult about the design of the rod, not to determine the manufacturing process.  Defendant also acknowledges that he had never engaged in such work before going to Korea.  Such knowledge may have been useful to Defendant when he began supervising the production of his own company's designs.  In any case, Defendant has essentially admitted to selling fishing rods in direct competition with Plaintiffs' rod, in violation of the restrictive covenant in his employment contract.  Plaintiffs have demonstrated a likelihood of success on the merits of their contract claim.

Rather than contest Plaintiff's claim that he breached the non-compete agreement, Defendant instead argues that the restrictive covenants in the contract are unenforceable. Restrictive covenants are enforceable only if they are "reasonable."  Bdo Seidman v. Hirshberg, 93 N.Y.2d 382, 388 (NY 1999).  "A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." Id. (emphasis in the original).  Failing to meet any one of these requirements renders the agreement invalid.  Id.  The standard applies to non-compete agreements, and such "a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'"  Id. (quoting Reed, Roberts Assocs. v. Strauman, 40 NY2d 303, 307 (NY 1976)).  "The protection of an employer's legitimate interests is limited to the protection of an employer's

trade secrets or confidential customer lists, or protection from an employee whose services are unique or extraordinary." Riedman Corp. v. Gallager, 49 A.D.3d 1188, 1189 (4th Dept. 2008). An employer also has "'a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which has been created and maintained at the employer's expense, to the employer's competitive detriment.'" Arthur J. Gallagher & Co. v. Marchese, 96 A.D.3d 791, 792 (2d Dept. 2012) (quoting Bdo Seiman, 93 N.Y.2d at 392)). "Absent anticompetitive misconduct by the employer . . . a restrictive covenant that is overbroad in some respect is 'partially enforceable to the extent necessary to protect [the employer's] legitimate interest.'" Genesee Val. Trust Co. v. Waterford Group, LLC, 130 A.D.3d 1555, 1557 (4th Dept. 2015) (quoting TBA Global, LLC v. Proscenium Events, LLC, 114 A.D.3d 571, 572 (N.Y. 2014)).

Defendant argues that the non-compete agreement is unreasonably broad in both its time and geographic scope. The agreement, Defendant contends, would "prevent [him] from soliciting, diverting, or accepting business from any customers or vendors of Cortland Line" and prevent him "from (**without any geographical limitation**) directly or indirectly engaging in any business competitive with Cortland." Defendant's Brief, dkt. # 22, at 13 (emphasis in original). Moreover, he claims, the agreement prevents him from earning a living in the fly fishing industry, a profession that has provided his livelihood for the past twenty years. Plaintiffs contend that they "do not seek to preclude Defendant from engaging in all aspects of the fly fishing business." Plaintiff's Reply Brief, dkt. # 33, at 12. They simply seek to prevent him from unfairly competing in a business that he was admittedly never previously involved in[,]" the design and sale of fly fishing rods. Plaintiffs also claim that the injunction they seek does not preclude Defendant from selling hand-

13

tied competition-style fishing flies, a business he was engaged in prior to working for Cortland Line.  Id.  Plaintiffs also admit that "[i]f his continuing obligations to Cortland Line are enforced, Defendant is still free to fish professionally, coach fly-fishing teams, instruct youth anglers, and otherwise work in the fly-fishing industry, so long as he is not competing with Cortland Line or utilizing its confidential information."  Id. at 13.

The Court finds that the restrictive covenant is reasonable in scope and duration. While the Court recognizes that the covenant is very broad in terms of its geographic limitations, the Court notes that the Defendant's own affidavit establishes the international scope of the specific segment of the fly-fishing business in which Cortland Line and Master Nymph are competitive.  Defendant traveled around the world to promote Cortland Line's products, to fish competitively, to supervise construction of Cortland's rods, and to build the connections which would allow him to sell his $950 fly rods to competitive fly fishers and others interested in the highest-end products.   As to the length of the non-compete agreement, Courts have found a two-year restrictive covenant to be of reasonable duration.  Willis of N.Y., Inc. v. DeFelice, 299 A.D.2d 250, 241 (1st Dept. 2002); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 234 A.D.2d 200, 202 (1st Dept. 1996); Alside Div. of Associated Materials, Inc. v. Leclair, 295 A.D.2d 873, 874 (3d Dept. 2002); Stiepleman Coverage Corp. v. Raifman, 258 A.D.2d 515, 516 (2d Dept. 1999); Giffords Oil Co. v. Wild, 106 A.D.2d 610, 610-11 (2d Dept. 1984) (permitting a three-year non-solicitation agreement).  Given the nature and length of the development process for fly rods described in the various affidavits, the Court finds that a two-year non-compete agreement is a reasonable amount of time to recognize the process of bringing such products to market.

14

Defendant further argues that the restrictive covenants are unenfroceable because they seek to protect interests that are not protectable.  As explained above, "[t]he protection of an employer's legitimate interests is limited to the protection of an employer's trade secrets or confidential customer lists, or protection from an employee whose services are unique or extraordinary." Riedman, 49 A.D.3d at 1189 (4th Dept. 2008). An employer also has "'a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which has been created and maintained at the employer's expense, to the employer's competitive detriment.'" Arthur J. Gallagher & Co, 96 A.D.3dat 792.  Defendant points out that items like locations for retail sales–Plaintiffs' customers–and products available are posted on Plaintiffs' website, and thus not confidential. Plaintiffs contend that Defendant's employment provided him with confidential and proprietary information regarding Cortland Line's "products, designs, business methods, pricing structures, and operations . . . as well as detailed information regarding Cortland Line's customers, prospective customers, and other industry-specific information and knowledge regarding Cortland's line's business."  Cortland Line's Reply Brief, dkt. # 33 at 13.  Cortland Line offers evidence that Defendant attempted to "penetrate" a confidential business relationship with one of Cortland Line's vendors to benefit Master Nymph, his new rod-making company.  Moreover, they argue Defendant's employment with Cortland Line came because of his unique skills and expertise, which the company employed in an attempt to break into new European and other markets.

The Court finds that Plaintiffs have demonstrated a reasonable likelihood that agreements are enforceable.  The affidavits supplied by the Plaintiffs indicate that Defendant had access to and used confidential materials about customer interests, likes

and preferences, confidential information on interfacing with manufacturers and vendors, and the use of products–like lines–that would become central to products Defendant attempted to sell.  Moreover, the evidence is replete with examples–many supplied by Defendant–of his particular expertise and extraordinary value to Cortland line when it came to both promoting and designing fishing rods, the same rods that Defendant now attempts to sell in competition with Plaintiffs' rods.  As such, Plaintiffs have pointed to a protectable interest and the restrictive covenants can form the basis of a preliminary injunction.

The Court agrees with the Defendant, however, that reading the non-compete covenant to prevent him from participating in the fly-fishing industry altogether would make the agreement entirely too broad.  The reading provided by the Plaintiffs, which limits the non-compete to include designing and selling fly-rods and using any confidential information obtained during his employment, sufficiently limits the restrictions to permit Defendant to continue to earn a living in the fly-fishing world.  Any injunction shall be read to permit Defendant to "fish professionally, coach fly-fishing teams, instruct youth anglers, and otherwise work in the fly-fishing industry, so long as he is not competing with Cortland Line or utilizing its confidential information."

### ii.    Irreparable Harm

Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" Forest City Daly Hous., Inc. v. Town of N. Hempsted, 175 F.3d 144, 153 (2d Cir. 1999) (quoting Rodriguez v. DeBuonon, 162 F.3d 56, 61 (2d Cir. 1998)).  "Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  Rodriguez by

16

Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998) (quoting Bell & Howell:  Mamiya
Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)).  As such, "'the moving party
must first demonstrate that such injury is likely before the other requirements for the
issuance of an injunction will be considered.'" Id. (quoting Reuters Ltd. v. United Press
Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990)).  "In the absence of a showing of irreparable
harm, a motion for a preliminary injunction should be denied."  Id.

      Defendant argues that Plaintiffs' motion is untimely, that they sat on their rights and
therefore cannot now seek the equitable remedy of an injunction. Courts consider delay in
seeking an injunction in assessing whether irreparable harm exists.  "Preliminary
injunctions are generally granted under the theory that there is an urgent need for speedy
action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights,
however, tends to indicate at least a reduced need for such drastic, speedy action."
Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); see also, Mortg. Resolution
Servicing, LLC v. JPMorgan Chase Bank, N.A., No. 15cv293, 2017 U.S. Dist. LEXIS
147921 at * 5 (S.D.N.Y. Sept. 12, 2017) (finding that nearly two-year delay between
discovery of facts giving rise to harms and seeking of preliminary injunction vitiated claims
of harm, since "[t]he Second Circuit has repeatedly held that such long delays prior to
seeking preliminary injunctive relief undercut a showing of irreparable harm.").  Still, the
Court must explore the causes of the delay in seeking injunctive relief.  A court can excuse
delay caused, in part, by "attempts to resolve the matter without litigation[.]" Innovative
Health Sys. v. City of White Plains, 117 F.3d 37, 44 (2d Cir. 1997).

      The Court disagrees.  Wilson's affidavit establishes that shortly after Wilson
discovered that Defendant had begun selling the offending rods in September 2017, he

17

contacted Defendant and warned him that such conduct violated the restrictive covenants in his employment contract.  See Wilson Affidavit, dkt. # 34, at ¶ 34.  Plaintiffs retained counsel, and by November, 20 2017, an attorney had sent Defendant a "cease and desist" letter to Defendant and the companies involved in manufacturing the Master Nymph rods. Id.  Defendant posted an item on Facebook on December 6, 2017, that confirmed he continued to sell the rods.  Id.  Defendant's attorney responded to the cease-and-desist letter on December 14, 2017.  Id.  Plaintiffs and local counsel began investigating the situation and discovered that Defendant had been selling Cortland lines products without Cortland Line's knowledge and permission.  id.  The record indicates that Plaintiffs filed an action in Cortland County on February 15, 2018.  See dkt. # 1-1.  The Court finds that, given Plaintiffs' attempts to investigate and rectify the situation short of filing a court action, Plaintiffs' delay in filing the action is excusable and does not demonstrate a lack of irreparable harm.

Plaintiff alleges that irreparable harm will come to Cortland Line if Defendant is not enjoined from engaging in unfair competition, disclosing confidential information, and soliciting Plaintiffs' customers.  Such harm, Plaintiff contends, will come from a loss of goodwill and business relationships in the fly-fishing industry as a result of Defendants' conduct.   "Loss of good will constitutes irreparable harm which cannot be compensated through money damages."  Ecoloab, Inc. v. Paolo, 753 F.Supp. 1100, 1110 (E.D.N.Y. 1991)  "The use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm."  Id. While the Court notes there is significant dispute about whether Defendant had access to and disclosed confidential customer lists, evidence presented by Plaintiff can be read to

18

conclude that Defendant took advantages of such relationships in an effort to build his

competing business.  That use of information, in addition to alleged attempts to poach

customers in other ways, constitutes sufficient evidence to find irreparable harm in this

respect.

Plaintiffs also point to two provisions in Defendant's employment contract which

Plaintiffs contend prevent Defendant from contesting that irreparable harm occurred.  One

provision of the contract provides that:

> If it appears that Jason Lieverst has disclosed (or has threatened to disclose)
> Information in violation of this Contract, Cortland Line shall be entitled to an
> injunction to restrain Jason Lieverst from disclosing, in whole or in part, such
> Information, or from providing any services to any party to whom such information
> has been disclosed or may be disclosed.

Employment Contract, dkt. # 34-1, at ¶ 1.   As part of the two-year non-compete

agreement discussed above, Defendant also agreed that "this non-compete provision will

not adversely affect [his] livelihood."  Id. at ¶ 3.

The Second Circuit has found that a provision in an employment contract that

establishes that the employer is entitled to injunctive relief if the former employee violates

a non-compete provision operates as an admission by the employee that violating the

non-compete agreement the employer "will suffer irreparable harm were [the employee] to

breach the contract's non-compete provision."  Ticor Title Ins. Co. v. Cohen, 173 F.3d 63,

69 (2d Cir. 1999).  Thus, to the extent that the employment contract contains an admission

that a violation of the agreement entitles Plaintiffs to injunctive relief, the Court finds that

Plaintiff has conceded that irreparable harm will come to Plaintiffs from his violation of that

agreement.  The Court recognizes that the contract here–unlike the contract in Ticor

Title–does not acknowledge that a violation of the non-compete portion of the restrictive

19

covenant will cause Plaintiffs irreparable harm.  That portion acknowledges only that Defendant will not suffer economic consequences from the non-compete provisions.  The part of the contract that acknowledges that an injunction is appropriate is the portion that precludes Defendant from disclosing confidential information.  Because the Court has found a likelihood of success on the breach-of-contract claim, however, and concluded that the restrictive covenant is enforceable–in part–because of the nature of the information it protects, the Court finds that the contract itself establishes irreparable harm.

Plaintiffs also argue that losing to a competitor Defendant's unique skills as a fly-fishing expert–which all acknowledge he possesses and which were the basis for a Visa application sponsored by the Plaintiffs–constitutes irreparable harm.  In Ticor Title, the Court of Appeals found that "[s]ervices that are not simply of value to the employer, but that may also truly said to be special, unique or extraordinary may entitle an employer to injunctive relief."  173 F.3d at 70.  "If the unique services of such employee are available to a competitor, the employer obviously suffers irreparable harm."  Id.  "Unique services have been found in various categories of employment where the services are dependent on an employee's special talents, such categories include musicians, professional althetes, actors and the lide."  Id.  An employer can obtain an injunction "to prevent the breach of an employment contract where the individual performer has such ability and reputation that his or her place may not be easily filled."  Id.  The employer need not show, however, that the employee who is the subject of the restrictive covenant is "the only 'star' of his employer, or that the business will grind to a halt if the employee leaves."  Id. at 71.  The focus, instead, is "on the employee's relationship to the employer's business," rather "than on the individual person of the employee."  Id.

20

Both sides have acknowledged that Defendant possesses unique and special skills and relationships in the fly fishing industry, and that Plaintiffs hired him because of those unique skills. They sponsored him for a special visa to take advantage of them. Permitting Defendant to use those skills to compete against the Defendant would therefore constitute irreparable harm. The Court finds that a likelihood of irreparable harm exists.

### iii.    Balance of Hardships

Plaintiffs argues that no hardship exists for a Defendant who is simply required to comply with a pre-existing contractual arrangement. A Court considering the balance of the hardships "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008). In evaluating the effect of the hardship on both parties, the Court finds that the balance of hardships favor the Plaintiffs, who hired Defendant with the understanding that he would not compete with Cortland Line for two years after leaving the company, and would not utilize confidential company information to do so. Failing to receive the benefit of its bargain would create a hardship to the Plaintiffs. See, e.g., Ayco Co., L.P. v. Frisch, 795 F.Supp.2d 193, 210 (N.D.N.Y. 2011)(irreparable harm because "Plaintiff would additionally lose the benefits of the bargain it negotiated with Defendants"). Moreover, Defendant admitted in his contract that "this non-compete provision will not adversely affect Jason Lieverst's livelihood." The restrictions on the operation of the non-compete provision outlined above will permit Lieverst to continue to earn a living from the fly-fishing industry, even if he will not be permitted to sell fly rods or use information he has about Plaintiffs' business in aid of his sales efforts. The Court finds that the balance of the

21

hardships favors the Plaintiffs.

### iv.    The Public Interest

Finally, the Court finds that the public interest is served by granting an injunction. While this matter involves a private business dispute, the public nevertheless has an interest in insuring that contracts are enforced and that parties to business contracts abide by their terms.

### v.    Conclusion as to Preliminary Injunction

The Court therefore finds that Plaintiffs have demonstrated a likelihood of success on the merits of their breach-of-contract claim, that they will likely suffer irreparable harm if an injunction is not granted, that the balance of hardships weighs in their favor, and that the public interest would be served by issuing an injunction. The Court will therefore grant the motion and issue an injunction.

### B.    Expedited Discovery

Plaintiffs' motion also contains a request for expedited discovery. The Court will deny that motion with leave to renew before the Magistrate Judge David E. Peebles, who has been assigned to supervise discovery in this matter.

### C.    Amount of Bond

Defendant requests that bond be set at $500,000, rather than the $200,000 previously ordered by the Court. Defendant offers no new arguments for why the bond should be increased, and the Court finds no reason to reconsider the request. The bond shall remain at the amount originally decided.

## IV.    CONCLUSION

22

For the reasons stated above, the Plaintiffs' motion for a preliminary injunction, dkt. # 7, is hereby **GRANTED**. During the pendency of this litigation, or until such time as the Court further orders, the Defendant is hereby enjoined from:

1. Utilizing or disseminating Cortland Line's confidential and proprietary business documents and information, including, but not limited to, any e-mails, books, records, data, reports, correspondence, customer or vendor information, client or prospect lists, referral lists, or other confidential business and proprietary documents or information of any kind, in written or electronic form, belonging to Cortland Line;

2. Directly or indirectly engaging in any business with customers and vendors with whom Defendant did business while employed by Cortland Line;

3. Directly or indirectly using knowledge gained while employed by Cortland Line to solicit divert or accept business from any customers or vendors of Cortland Line;

4. Destroying, deleting, altering or removing any computer files or documents or other property that belongs to Cortland Line or any customers or vendors of Cortland Line; and

5. Destroying, deleting, altering or removing any computer files, records, communications or information which relate to Defendant's communications with or to any of Cortland Line's customers or vendors, or to the claims set forth in the Verified Complaint filed in this action.

This injunction will permit Defendant to "fish professionally, coach fly-fishing teams,

23

instruct youth anglers, and otherwise work in the fly-fishing industry, so long as he is not competing with Cortland Line or utilizing its confidential information." Plaintiffs shall post bond of $200,000 as required by Local Rule 65.1.1 or as previously ordered by the Court. To the extent that Plaintiffs have moved for particular changes to the discovery process, that motion is denied with leave to renew before the Magistrate Judge.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: April 6, 2018

24